*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
HOLIFIELD, HACKEL, and DALY
Appellate Military Judges

———————————

**UNITED STATES**
*Appellee*

**v.**

**Cody B. WATLINGTON**
Machinist Mate (Nuclear) Third Class (E-4), U.S. Navy
*Appellant*

**No. 202200076**

———————————

Decided: 6 October 2023

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Eric A. Catto (arraignment)
Kimberly J. Kelly (trial)

Sentence adjudged 2 December 2021 by a general court-martial convened at Naval Station Mayport, Florida, consisting of officer and enlisted members. Sentence in the Entry of Judgment: confinement for two years and a bad-conduct discharge.

For Appellant:
*Lieutenant Aiden J. Stark, JAGC, USN*

For Appellee:
*Lieutenant Michael A. Tuosto, JAGC, USN*
*Lieutenant Colonel James A. Burkart, USMC*

Chief Judge HOLIFIELD delivered the opinion of the Court, in which Senior Judge HACKEL and Judge DALY joined.

_____

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

_____

HOLIFIELD, Chief Judge:

A panel of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of involuntary manslaughter by culpable negligence in violation of Article 119, Uniform Code of Military Justice [UCMJ], for negligently shooting a fellow Sailor in the chest resulting in his death.[1] Appellant was also found guilty of negligent homicide in violation of Article 134, UCMJ, for the same acts.[2] The military judge conditionally dismissed Appellant's negligent homicide conviction and Appellant was sentenced only for involuntary manslaughter.

Appellant asserts eight assignments of error [AOEs] which we reorder as follows: (1) the evidence is legally and factually insufficient to support the guilty findings; (2) trial counsel was disqualified because he was an accuser; (3) Director, Naval Reactors engaged in unlawful command influence [UCI] when he forwarded the charges to a subordinate commander and said he would fund the trial; (4) trial counsel committed prosecutorial misconduct; (5) the military judge abused her discretion by denying Appellant's requested instruction on the issue of culpable negligence; (6) the military judge abused her discretion by allowing the victim's brother to make an unsworn victim impact statement; (7) a bad-conduct discharge was inappropriately severe; and (8) Appellant was entitled to a unanimous verdict. We find no prejudicial error and affirm.[3]

---

[1] 10 U.S.C. § 919.

[2] 10 U.S.C. § 934.

[3] We have reviewed Appellant's fifth, sixth, and eighth AOEs and find them to be without merit. *United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

## I. BACKGROUND

*1. The Shooting*

Appellant and Machinist Mate (Nuclear) Third Class [MMN3] Hotel were friends who lived together with four other Sailors in Charleston, South Carolina, where they attended nuclear power school.[4] Many of these Sailors, including Appellant and MMN3 Hotel, owned and were experienced with firearms.

On the evening of 7 April 2020, Appellant was handling a Beretta APX pistol that he had recently purchased. He removed the loaded magazine, then repeatedly pulled back the slide and released it. After doing this several times, Appellant inserted a loaded magazine, laid the gun on the living room table, and walked away.

Appellant had recently learned there were two ways to field strip the Beretta APX.[5] Either method first involves removing the magazine and clearing the chamber of any ammunition. For the Beretta APX, one then (1) retracts the slide slightly, (2) presses the striker deactivation button on the right side of the firearm (resulting in a click indicating that the striker has been released), and (3) presses the takedown lever on the right side of the weapon and rotates the lever down 90 degrees, at which point the slide can be removed from the frame.[6] The second method of field stripping the Beretta APX is similar, but instead of pressing the striker deactivation button, one pulls the trigger before rotating the takedown lever and removing the slide.[7]

Intending to demonstrate this second method to MMN3 Hotel, Appellant picked up his firearm from where he had left it a few minutes before and attempted to remove the slide using the trigger-pull method. Appellant did not remove the magazine before doing so, nor did he clear the chamber. Appellant stood over MMN3 Hotel with the plan on removing the slide and letting it drop into his friend's lap.

---

[4] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

[5] Field stripping is separating the slide and its components from the frame of the firearm in order to clean and maintain it. R. at 755.

[6] R. at 755-56.

[7] R. at 756.

When his initial attempt to remove the slide did not work, Appellant racked the slide—chambering a round—and again attempted to remove the slide using the trigger-pull method. He did this while pointing the gun at his friend. This time, when he pulled the trigger, he fired a bullet into MMN3 Hotel's chest, killing him.

### 2. The Preferral and Referral Process[8]

In August 2020, Legalman First Class [LN1] Foxtrot was assigned to Region Legal Service Office Southeast [RLSO SE]. Following normal practice, one of RLSO SE's trial counsel asked LN1 Foxtrot if he was willing to review the investigation and prefer the proposed charges if he agreed there was probable cause to support them. When LN1 Foxtrot agreed, he was given a "proposed charge sheet" and "written materials" regarding the case.[9] These materials included "a preliminary investigation, . . . a 70-page Naval Criminal Investigative Service [NCIS] Report of Investigation [ROI], including a police report and summaries of interviews of [Appellant] and witnesses to the shooting."[10]

After reviewing the evidence, LN1 Foxtrot told the trial counsel that, unless there was any other evidence to review, he was ready to prefer charges.[11] He then preferred the charges on 31 August 2020.

During a subsequent Article 39(a), UCMJ, hearing, LN1 Foxtrot testified that, "[a]t the time of preferral, [he] understood his obligations as accuser [included] reviewing the proposed charge sheet and the supporting evidence and deciding whether or not the proposed charges were supported by probable cause. He erroneously understood probable cause to mean proof beyond a reasonable doubt."[12] He also "understood that he could refuse to prefer the proposed charges if not supported by probable cause and felt comfortable in doing

---

[8] The description of events in this section are taken from the military judge's findings of fact in her ruling denying the Defense's motion to disqualify trial counsel and motion to dismiss for improper preferral, forwarding and referral. App. Ex. IX. We adopt these findings of fact as they accurately reflect the record.

[9] App. Ex. IX, at 2. The proposed charge sheet included charges under Articles 118, UCMJ (murder while engaging in an act inherently dangerous to another) and 119, UCMJ (involuntary manslaughter – culpable negligence). 10 U.S.C. §§ 918, 919.

[10] App. Ex. IX, at 2.

[11] Although he received photographs of the crime scene and victim, as well as videos of the summarized interviews, LN1 Foxtrot opted not to review them.

[12] App. Ex. IX, at 2.

so if necessary."[13] In fact, he had previously refused to prefer charges in another RLSO SE case due to insufficient evidence.

A preliminary hearing officer [PHO], appointed by the commanding officer of Naval Nuclear Power Training Unit [NNPTU], conducted an Article 32, UCMJ, hearing. The PHO found no probable cause for the charged offenses and recommended against referring the charges to a court-martial. The NNPTU commanding officer dismissed without prejudice the Article 118, UCMJ, charge, but disagreed with the PHO regarding the Article 119, UCMJ, charge. Accordingly, the NNPTU commanding officer forwarded the latter charge to Commander, Military Personnel Detachment, Office of Naval Reactors, Department of Energy [Naval Reactors], the general court-martial convening authority in NNPTU's chain of command, recommending referral to a general court-martial.

Naval Reactors declined to exercise its convening authority, instead deferring to Commander, Navy Region Southeast [CNRSE]. The NNPTU then forwarded the Article 119, UCMJ, charge to CNRSE, stating in its forwarding letter that the evidence also supported the lesser included offense of negligent homicide.

The CNRSE staff judge advocate [SJA] advised CNRSE that he should dismiss the charge and specification under Article 119, UCMJ, prefer, instead, a charge of negligent homicide under Article 134, and order a new preliminary hearing. When CNRSE indicated his concurrence in his SJA's proposed course of action, a paralegal at CNRSE advised RLSO SE trial counsel of CNRSE's decision to dismiss the involuntary manslaughter charge and to have preferred a negligent homicide charge.

Trial counsel again approached LN1 Foxtrot, telling him, "We are looking to re-prefer this case under a standard of negligent homicide vice murder and involuntary manslaughter."[14] LN1 Foxtrot had no knowledge of the procedural history of the case. He was not aware of why the Government was seeking to re-prefer or what had happened to the original charge sheet, nor did he know of the PHO's recommendation or CNRSE's guidance.

Relying on his previous, August 2020, review of the evidence, LN1 Foxtrot did not review any additional evidence before preferring a charge of negligent homicide on 10 December 2020. Again, LN1 Foxtrot knew he was free to decline to prefer any charge.

---

[13] *Id.*

[14] *Id.* at 4.

At a second preliminary hearing, the same PHO reviewed the same evidence, plus a Navy Times article and a video entitled "Beretta APX 9mm Disassembly Video." This time the PHO found probable cause for the negligent homicide charge under Article 134, UCMJ. But the PHO also opined that CNRSE was disqualified to act as convening authority in this case, as he had become an accuser when his desires regarding charges were passed to the trial counsel. Based on this, CNRSE returned the case to Naval Reactors without a recommendation as to disposition.

On 10 February 2021, Naval Reactors forwarded the case without recommendation to Commander, Navy Region Mid-Atlantic [CNRMA] for disposition. Naval Reactors, "in his role as commander atop [Appellant's] chain of command, agreed to fund any court-martial should CNRMA choose to convene a court-martial."[15] Trial counsel was unaware the matter had been sent to CNRMA until after the latter accepted the case.

Trial counsel met with CNRMA's SJA on 9 March 2021 and recommended that the Article 118 and Article 119 charges be re-preferred and referred to court-martial along with the Article 134 charge. Receiving the SJA's concurrence regarding the Articles 119 and 134 offenses, trial counsel approached LN1 Foxtrot a third time. Again, LN1 Foxtrot was unaware of the case's procedural history, including the change in convening authority, the reasons why re-preferral was being sought, the results of either preliminary hearing, or any guidance from CNRMA. And, again, LN1 Foxtrot did not review any evidence, relying instead on his August 2020 review of the evidence to find probable cause. On 16 March 2021, LN1 Foxtrot preferred an Article 119 charge identical to the previous Article 119 charge.

The CNRMA SJA presented her commander with the preferred charges along with a recommendation that he refer both charges to a general court-martial. Based upon this advice and a review of both PHO reports and their enclosures, CNRMA referred both the Article 119 and Article 134 charges to a single general court-martial on 30 March 2021.

### 3. The Trial

Appellant's trial occurred from 29 November to 2 December 2021. After presentation of the Government's case, the Defense moved for a finding of not guilty pursuant to Rule for Courts-Martial [R.C.M.] 917. The military judge

---

[15] *Id.* at 6.

denied the motion and the Defense rested without presenting a case. After argument, during which no objections were made, the court closed for deliberations. The members subsequently returned a finding of guilty to both charges.

Additional facts necessary to resolving the AOEs are provided below.

## II. DISCUSSION

### A. The Evidence is Legally and Factually Sufficient to Support the Guilty Findings.

Appellant asserts that the evidence at trial was legally and factually insufficient to support findings of guilty for negligent homicide and involuntary manslaughter. Specifically, Appellant—focusing on the differences between an M9 Beretta and a Beretta APX—claims "there is no evidence of any culpable disregard of foreseeable consequences on [Appellant's] part."[16] We review such questions de novo.[17]

To determine legal sufficiency, we ask whether, "considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt."[18] In conducting this analysis, we must "draw every reasonable inference from the evidence of record in favor of the prosecution."[19] In doing so, we are mindful that "[f]indings may be based on direct or circumstantial evidence."[20]

In evaluating factual sufficiency, we determine "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we] are . . . convinced of [Appellant's] guilt beyond a reasonable doubt."[21] In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption

---

[16] Appellant's Brief at 19.

[17] Article 66(d)(1), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[18] *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[19] *United States v. Gutierrez*, 74 M.J. 61, 65 (C.A.A.F. 2015) (citation and internal quotation marks omitted).

[20] *United States v. Long*, 81 M.J. 362, 368 (C.A.A.F. 2021).

[21] *Turner*, 25 M.J. at 325.

of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt."[22] Proof beyond a "[r]easonable doubt, however, does not mean the evidence must be free from conflict."[23]

### 1. Involuntary Manslaughter

Appellant was found guilty of involuntary manslaughter by culpable negligence in violation of Article 119, UCMJ, for killing MMN3 Hotel by shooting him in the chest with a firearm.

For Appellant to be found guilty of involuntary manslaughter by culpable negligence, the Government had to prove: (1) that MMN3 Hotel was dead; (2) that Appellant unlawfully killed MMN3 Hotel by shooting him in the chest with a firearm; and (3) that Appellant's act of shooting MMN3 Hotel was the result of culpable negligence.[24] Negligence is "conduct that 'involves the creation of substantial and unjustifiable risk of which the person *should be aware* in view of all the circumstances.'"[25] The President has defined "culpable negligence" as:

> a degree of negligence greater than simple negligence. It is a negligent act or omission accompanied by a culpable disregard for the foreseeable consequences to others of that act or omission. Thus the basis of a charge of involuntary manslaughter may be a negligent act or omission which, when viewed in the light of human experience, might foreseeably result in the death of another, even though death would not necessarily be a natural and probable consequence of the act or omission. Acts which may amount to culpable negligence include negligently conducting target practice so that the bullets go in the direction of an inhabited house within range; pointing a pistol in jest at another and pulling the trigger, believing, but without taking reasonable pre-

---

[22] *Washington*, 57 M.J. at 399.

[23] *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

[24] *MCM*, pt. IV, para. 57.b.(2).

[25] *United States v. Oxendine*, 55 M.J. 323, 325 (C.A.A.F. 2001) (quoting *United States v. Brown*, 22 M.J. 448, 450 (C.M.A. 1986)) (emphasis in original).

cautions to ascertain, that it would not be dangerous; and care-
lessly leaving poisons or dangerous drugs where they may en-
danger life.[26]

"The test for foreseeability is 'whether a reasonable person, in view of all the circumstances, would have realized the substantial and unjustifiable danger created by his acts.'"[27]

There is no debate regarding the first two elements of this offense: MMN3 Hotel is dead and Appellant unlawfully killed him by shooting him in the chest with a firearm. What Appellant challenges is whether the evidence was legally and factually sufficient to prove culpable negligence. He argues that the evidence does not demonstrate that he intentionally disregarded a foreseeable consequence of his actions. In essence, Appellant attempts to impose a subjective intentionality element where none exists. As just explained, the test is not whether Appellant specifically chose to disregard the substantial and unjustifiable danger created by his acts, but whether a reasonable person in the same circumstances would realize the danger.

In arguing for a subjective standard, Appellant relies on *United States v. White*: "Mere lack of foresight, stupidity, irresponsibility, thoughtlessness, ordinary carelessness, however serious the consequences may happen to be, do not constitute 'culpable negligence,' but for culpable negligence there must exist in the mind of accused, at the time of act or omission, a consciousness of probable consequences of the act and a wanton disregard for them."[28] But this language from a 1953 case does not reflect the current state of the law.

Our Superior Court has since held that, for a charge of negligent homicide, "it is not necessary that appellant foresaw a fatal outcome."[29] It is enough that "a reasonable person, in view of all the circumstances"—here, that Appellant placed a loaded magazine in the Beretta APX before setting it down; that Appellant picked it up minutes later to field strip it; that Appellant intended the slide to fall into his friend's lap when he did so; that Appellant pointed the weapon at his friend when he racked the slide, chambered a round, and pulled

---

[26] *MCM*, pt. IV, para. 57.c.(2)(a)(i).

[27] *Oxendine*, 55 M.J. at 325 (quoting *United States v. Henderson*, 23 M.J. 77, 80 (C.M.A. 1986)).

[28] *United States v. White*, 7 C.M.R. 448, 451 (NBR 1953) (quoting *People v. Carlson*, 176 Misc 230, 26 NYS (2nd) 1003, 1004; CM ETO 15346, Fondren.).

[29] *Henderson*, 23 M.J. at 79.

the trigger—would have recognized the "substantial and unjustifiable danger" created by Appellant's actions.[30]

Appellant makes much of the fact that the M9 Beretta, with which he was more familiar, has an external safety lever and disassembles differently from the APX, which has no such external safety lever. Rather than see this distinction as supporting his claim of legal and factual insufficiency, we add Appellant's relative unfamiliarity with the Beretta APX to those "circumstances" assumed known by a reasonable person in assessing the "substantial and unjustifiable danger"—further supports a finding of culpable negligence.

Based on the undisputed facts before us, we conclude a reasonable fact finder could have found beyond a reasonable doubt that Appellant's acts constituted culpable negligence. And, like the members in this court-martial, we are convinced of Appellant's culpable negligence beyond a reasonable doubt. Accordingly, we find the evidence here legally and factually sufficient.

### 2. Negligent Homicide

Appellant also claims that the evidence is legally and factually insufficient to support the finding of guilty for negligent homicide. As explained above, the military judge conditionally dismissed the negligent homicide charge and Appellant was only sentenced for the involuntary manslaughter charge. Because we affirm Appellant's conviction for involuntary manslaughter, Appellant's claim is moot. Nevertheless, we have reviewed the evidence in this case and are confident that the evidence is legally and factually sufficient to support the finding of guilt for negligent homicide.

## B. Trial Counsel did not become an Accuser

Appellant asserts that trial counsel was disqualified from prosecuting this case under R.C.M. 502(d)(3). He argues that, since Petty Officer Foxtrot did not review the evidence again before signing the second and third charge sheets, he must have signed them simply because trial counsel directed him to. By directing Petty Officer Foxtrot to prefer the charges, Appellant claims, the trial counsel became a nominal accuser.

---

[30] *Id*. at 79-80. *Cf. United States v. Weller*, 2012 CCA LEXIS 154, *9 (N-M Ct. Crim. App. 2012) ("We are convinced beyond any reasonable doubt that the appellant, disregarding years of prior training and basic common sense, pointed his loaded M9 at LCpl RM and pulled the trigger, seriously wounding his fellow Marine. The appellant's actions clearly entail a culpable disregard for the foreseeable consequences to others of that act.") (internal quotation marks omitted).

According to R.C.M. 502(d)(3), "No person shall act as trial counsel or assistant trial counsel . . . in any case in which that person is or has been . . . [t]he accuser." "The term 'accuser' means a person who signs and swears to charges, any person who directs that charges nominally be signed and sworn to by another, and any other person who has an interest other than an official interest in the prosecution of the accused."[31] Whether someone is an accuser is a question of law we review de novo.[32]

Petty Officer Foxtrot testified that he reviewed the evidence before preferring the charges on the initial charge sheet and relied on his memory of that initial review when he preferred the others. He further testified that he understood his responsibilities as a potential accuser and that he was free to decline to prefer charges. In each instance he was otherwise unaware of the case's procedural history, having no knowledge of the PHO's recommendations, the reasons why re-preferral was sought, or any convening authority or SJA's wishes. This, combined with the fact that the record contains no evidence that trial counsel directed Petty Officer Foxtrot to nominally sign the charge sheets, convinces us that Appellant's argument lacks merit.

## C. Director, Naval Reactors did not commit Unlawful Command Influence

We review allegations of UCI de novo, accepting a military judge's findings of fact unless clearly erroneous.[33]

Our superior Court has long held that UCI is the "mortal enemy of military justice."[34] The prohibition against UCI stems from Article 37(a), UCMJ, which provides: "No person subject to [the UCMJ] may attempt to coerce or, by any unauthorized means, influence the action of a court-martial . . . or any member thereof."[35]  According to Article 37(a)(5)(B), UCMJ, "No superior convening authority or officer may direct a subordinate convening authority or officer to make a particular disposition in a specific case or otherwise substitute the discretion of such authority or such officer for that of the subordinate convening authority or officer."

---

[31] Art. 1(9), UCMJ.

[32] *United States v. Ashby*, 68 M.J. 108, 129 (C.A.A.F. 2009).

[33] *United States v. Barry*, 78 M.J. 70, 77 (C.A.A.F. 2018).

[34] *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986).

[35] 10 U.S.C. § 837.

Yet, even when the prohibition against UCI is violated, "[n]o finding or sentence of a court-martial may be held incorrect on the ground of a violation of this section unless the violation materially prejudices the substantial rights of the accused."[36]

The Defense has the initial burden of raising the issue of UCI.[37] "The initial burden of showing potential [UCI] is low, but is more than mere allegation or speculation."[38] The evidentiary standard is "some evidence."[39] At trial, "the accused must show facts which, if true, constitute [UCI], and that the alleged [UCI] has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings."[40] But "prejudice is not presumed until the defense produces evidence of proximate causation between the acts constituting [UCI] and the outcome of the court-martial."[41] "For an accused to be entitled to appellate action on his case, the unlawful influence must be the proximate cause of the unfairness of his court-martial."[42]

"Once the issue is raised at the trial level, the burden shifts to the Government, which may either show that there was no UCI or show that the UCI will not affect the proceedings."[43] The burden of disproving the existence of UCI or proving that it will not affect the proceeding does not shift until the Defense meets the burden of production. If the Defense meets that burden, a presumption of prejudice is created.[44] To overcome this presumption, a reviewing court must be convinced beyond a reasonable doubt that the UCI had no prejudicial effect on the court-martial.[45]

---

[36] Art. 37(c), UCMJ.

[37] *Barry*, 78 M.J. at 77 (internal citations omitted).

[38] *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013) (internal citations omitted).

[39] *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999).

[40] *Id.*

[41] *Id.*

[42] *United States v. Reynolds*, 40 M.J. 198, 202 (C.A.A.F. 1994).

[43] *Biagase*, 50 M.J. at 150 (additional citation omitted).

[44] *United States v. Douglas*, 68 MJ 349, 354 (C.A.A.F. 2010) (citing *Biagase*, 50 M.J. at 150).

[45] *Id.*

Appellant claims the military judge "refused to rule on the [UCI] matter . . . because it was not 'properly raised before the court.'"[46] This is a disturbingly misleading abridgement of the judge's statement. In her ruling on the Defense's Motion to Dismiss Pursuant to Improper Preferral, Forwarding, and Referral, the military judge actually wrote:

> "At the Article 39a [sic],the Defense mentioned (cursorily in some instances) for the first time the following arguments: . . . Naval Reactors in essence committed unlawful command influence (although the defense did not use those words) by offering to pay the cost of any court-martial convened by CNRMA . . . . *There is no evidence whatsoever to support any of these allegations, nor were they properly raised before the court.*"[47]

Thus, not only did the military judge acknowledge that the Defense had raised the issue of UCI, but she also found that Appellant failed his initial burden of showing "some evidence of facts, which if true, constitute [UCI]."[48]

Appellant argues that the military judge "found as fact that Naval Reactors forwarded the case to CNRMA and 'agreed to fund any court-martial.'"[49] He then cites this as some evidence of UCI, claiming it was an indication to CNRMA of what Naval Reactors expected the  former to do. But, again, this is a misleading truncation of the military judge's finding. She actually found that "Naval Reactors forwarded the case to [CNRMA] for disposition and *without recommendation*" and "agreed to fund any court-martial *should CNRMA choose to convene a court-martial.*"[50] This finding of fact is clearly supported by the evidence.

We agree with the military judge that there simply is no evidence in the record that Naval Reactors intended to or did influence CNRMA's referral decision. Accordingly, we find Appellant failed to meet the low threshold for raising the issue at trial. As the issue of UCI was not adequately raised by the Defense, no analysis of burden shifting or material prejudice was (or is now) required.

---

[46] Appellant's Brief at 40.

[47] App. Ex. IX, at 19 n.4 (emphasis added).

[48] *United States v. Harvey*, 64 M.J. 13, 18 (C.A.A.F. 2006) (citation and internal quotation marks omitted).

[49] Appellant's Brief at 12.

[50] App. Ex. IX, at 6 (emphasis added).

**D. Trial Counsel did not Commit Prosecutorial Misconduct**

Appellant asserts that trial counsel committed prosecutorial misconduct when he: (1) preferred charges without probable cause; (2) participated in the court-martial despite being an accuser; (3) misled the military judge at the R.C.M. 917 motion; and (4) misled the members in closing and rebuttal arguments.

Prosecutorial misconduct occurs when a prosecutor "oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense."[51] It is "defined as action or inaction by a prosecutor in violation of some legal norm or standard, e.g., a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon."[52]

We review prosecutorial misconduct and improper argument de novo.[53] When properly objected to at trial, we review for prejudicial error to an appellant's substantial rights.[54] "Challenged argument is reviewed not based on 'words in isolation, but on the argument viewed in context,' and 'within the context of the entire court-martial.'"[55]

If no objection is made, "we hold the appellant has forfeited his right to appeal and we review for plain error."[56] "The plain error doctrine is invoked to rectify those errors that seriously affect the fairness, integrity or public reputation of judicial proceedings. As a consequence, it is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."[57] "Under plain error review, Appellant bears the burden of demonstrating that: '(1) there was error, (2) the error was clear and obvious, and (3) the

---

[51] *United States v. Fletcher*, 62 M.J. 175, 178 (C.A.A.F. 2005) (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)).

[52] *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citing *Berger,* 295 U.S. at 88)).

[53] *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018) (citing *United States v. Sewell,* 76 M.J. 14, 18 (C.A.A.F. 2017)).

[54] *Id.* (citing *Fletcher*, 62 M.J. at 179); *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019).

[55] *United States v. Causey*, 82 M.J. 574, 581 (N-M Ct. Crim. App. 2022) (citing *United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F. 2000)).

[56] *Id.*

[57] *United States v. Fisher*, 21 M.J. 327, 328-29 (C.M.A. 1986).

error materially prejudiced a substantial right of the accused.'"[58] "Thus, [when reviewing claims of improper argument] we must determine: (1) whether trial counsel's arguments amounted to clear, obvious error; and (2) if so, whether there was a reasonable probability that, but for the error, the outcome of the proceeding would have been different."[59]

As explained above, we find that trial counsel was not an accuser in this case and Appellant's argument on that point fails. We turn, then, to his remaining claims of prosecutorial misconduct.

### a. Pursuing charges without probable cause[60]

While Appellant did preserve the issue of whether or not trial counsel was an accuser by raising it at trial, he did not argue that trial counsel was disqualified on the basis of pursuing charges not supported by probable cause. We therefore review this claim for plain error.

Appellant's argument appears to be based, first, on his claim that the evidence is legally and factually insufficient (which we find meritless), and, second, on the PHO's initial finding of no probable cause for the involuntary manslaughter charge. But there were two preliminary hearings in this case. At the first, the PHO found no probable cause to support murder and involuntary manslaughter charges. At the second, the same PHO found probable cause to support a negligent homicide charge. The convening authority subsequently referred both the negligent homicide charge and the involuntary manslaughter charge to a general court-martial.

Appellant fails to show how the evidence reviewed by Petty Officer Foxtrot was insufficient to support his conclusion that probable cause existed to support the charges.[61] We find that Appellant has not demonstrated that there was error, much less that such error was plain or obvious.

---

[58] *United States v. Cueto*, 82 M.J. 323, 334 (C.A.A.F. 2022) (quoting *United States v. Jones*, 78 M.J. 37, 44 (C.A.A.F. 2018)).

[59] *Voorhees*, 79 M.J. at 9 (internal citation and quotation omitted).

[60] Appellant uses the term "preferring charges." But, as we have found that trial counsel was not a nominal accuser and, therefore, was not the person who preferred the charges, we will use "pursuing charges."

[61] LN1 Foxtrot, based on an erroneous understanding of the preferral standard, actually found that the evidence proved the charges beyond a reasonable doubt—a significantly higher bar.

b. Trial counsel did not mislead the military judge

Appellant claims that trial counsel misled the military judge during argument on the R.C.M. 917 motion to dismiss the involuntary manslaughter charge. Trial counsel argued:

> Just in meeting the burden of some evidence in this particular motion, the government would rest on Prosecution Exhibit 6 where Petty Officer Watlington states, you know, in several different ways that he placed a magazine in his—in a Beretta APX, walked up to the—walked up to Petty Officer [Hotel], pulled the trigger. At one point after he pulled the trigger, it didn't work the way he originally thought. In fact, he says that he reflected on this and thought it was weird, that after that he racked it, pulled the trigger again, it fired.[62]

Appellant claims that trial counsel's statement implies that he (Appellant) knew he was operating a Beretta APX rather than an M9—a critical distinction in his view. Because Appellant did not object to trial counsel's argument at trial we review for plain error.

Contrary to Appellant's claim, the critical information here is not that the gun in question was a Beretta APX or an M9, rather it is the fact that Appellant inserted a loaded magazine into the gun, then attempted to disassemble the firearm while pointing it at Petty Officer Hotel without first ensuring it was not loaded. Moreover, after his initial attempt to remove the slide failed, he racked the weapon with the loaded magazine inserted, then again attempted to remove the slide by pulling the trigger while pointing the gun at Petty Officer Hotel.

Nothing in the military judge's ruling denying Appellant's R.C.M. 917 motion indicates that the distinction between an APX and M9 was relevant to her analysis. Rather, the military judge highlighted that Appellant admitted during his interview immediately following the shooting that he had put the loaded magazine back in the gun, then, without being sure the gun was not loaded, he attempted to disassemble the weapon using a technique that required pulling the trigger.[63]

Moreover, trial counsel's statement was factually true. Appellant did insert the magazine into his Beretta APX. Trial counsel's argument was not that Ap-

---

[62] R. at 776.

[63] R. at 777.

pellant knew it was or was not an APX, but simply that he inserted the magazine into the weapon he held. In short, trial counsel's statements were not misleading. Appellant has failed to show that trial counsel's argument constitutes plain error.

Finally, Appellant argues that the trial counsel committed misconduct by making an argument to the military judge that contradicted trial counsel's closing argument to the members. Specifically, Appellant claims that trial counsel's statement that "'[Appellant] 'state[d] . . . that he placed a magazine in his—in a Beretta APX' . . . conflicted with his closing arguments that [Appellant] did not know he handled a Beretta APX."[64] Rather than show inconsistency or contradiction on the trial counsel's part, however, this argument reveals Appellant's misstatement of the record. During his argument, trial counsel actually said, "Now we know [Appellant] knows about guns generally. The problem is he didn't know about this gun specifically, the Beretta APX."[65] This is quite different from saying "Appellant did not know he handled a Beretta APX." There is no contradiction between trial counsel's statements to the military judge and his argument to the members. So, again, there is no error, let alone plain or obvious error.

### c. Trial counsel did not mislead the members

Appellant also claims that trial counsel misled the members when he argued during closing that "the design of this Beretta—this particular Beretta … it fires *like every other gun.*"[66] Because Appellant did not object to trial counsel's argument at trial, we review for plain error.

Again, Appellant's argument relies on an unfounded emphasis on the distinction between the design of the Beretta M9 and the Beretta APX. Contrary to Appellant's framing of trial counsel's statement, the point made during closing argument was about Appellant's act of racking the gun and pulling the trigger without first ensuring it was not loaded. Specifically, trial counsel told the members: "[H]ere's the basic gist of what's important about the design of this Beretta—this particular Beretta. Is that if you put a loaded magazine in it and then rack it and then pull the trigger, it fires like every other gun, like it's supposed to. You have to unload it. You always do that before messing with a gun."[67] Nothing in trial counsel's argument can be understood to mean that

---

[64] Appellant's Brief at 32 (quoting R. at 846, 849).

[65] R. at 846.

[66] Appellant's Brief at 25 (quoting R. at 869) (emphasis Appellant's).

[67] R. at 869.

the distinction between the M9 and the APX was critical to a finding of culpable negligence. Again, trial counsel's argument was factually accurate and not misleading. Appellant thus fails to show that trial counsel's argument constitutes plain error.

**E. Appellant's Sentence is not Inappropriately Severe.**

Appellant asserts that the portion of his sentence imposing a bad-conduct discharge is inappropriately severe. We review sentence appropriateness de novo.[68]

This Court may only affirm "the sentence, or such part or amount of the sentence, as the Court finds correct in law and fact and determines, on the basis of the entire record, should be approved."[69] In exercising this function, we seek to ensure that "justice is done and that the accused gets the punishment he deserves."[70] The review requires an "individualized consideration of the particular accused on the basis of the nature and seriousness of the offense and the character of the offender."[71] We have significant discretion in determining sentence appropriateness, but may not engage in acts of clemency.[72]

A court-martial shall impose punishment that is sufficient, but not greater than necessary, to promote discipline and to maintain good order and discipline.[73] Among other factors, the sentence needs to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, promote adequate deterrence of misconduct, protect others from further crimes by the accused, and rehabilitate the accused.[74]

There is no disagreement that this is a truly tragic case. A Sailor is dead. Another Sailor must live with the knowledge that his actions caused that death. But, while Appellant clearly did not intend to shoot and kill his friend,

---

[68] *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006).

[69] Article 66(d)(1), UCMJ.

[70] *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988).

[71] *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (citation and internal quotation marks omitted).

[72] *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

[73] R.C.M. 1002(f).

[74] R.C.M. 1002(f)(3)(A)-(F).

the fact is, through his own culpable negligence, he is solely responsible for MMN3 Hotel's death.[75]

Weighing all the evidence, we find that Appellant's sentence was adjudged with individualized consideration based on both the nature and seriousness of Appellant's offenses and character. After reviewing the record as a whole, we find the sentence to be correct in law and not inappropriately severe. Furthermore, it appropriately reflects the matters in extenuation, mitigation, and aggravation presented, and it should be approved.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[76]

The findings and sentence are **AFFIRMED**.

FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[75] Appellant himself best summarizes the incident: "This is why you don't f*** with guns." App. Ex. XLVIII, at 7.

[76] Articles 59 & 66, UCMJ.